**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 51 PENSION FUND, *Individually And Behalf Of All Others Similarly Situated*,<br><br>Plaintiff,<br><br>vs.<br><br>DARDEN RESTAURANTS, INC., CLARENCE OTIS, JR., and C. BRADFORD RICHMOND,<br><br>Defendants. | **CASE NO.:  6:08-CV-00388-PCF-DAB** |

**AMENDED CLASS ACTION COMPLAINT**

17551v1

Lead Plaintiffs Carpenters Pension Trust Fund for Northern California and Carpenters Annuity Trust Fund for Northern California (collectively, "Carpenters Funds" or "Plaintiffs") have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Darden Restaurants Inc. ("Darden" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, as well as analyses of the Company's Class Period financial assumptions and performance, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Darden between June 19, 2007 and December 18, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Darden, headquartered in Orlando, Florida, is the world's largest company-owned and operated full-service restaurant company with almost $6.7 billion in annual sales and approximately 180,000 employees.  The Company owns and operates more than 1,700 restaurants including Red Lobster, Olive Garden, Bahama Breeze, and Seasons 52 (the "Darden Legacy Restaurants"), as well as LongHorn Steakhouse ("LongHorn") and The Capital Grille ("Capital Grille").  Darden acquired LongHorn and Capital Grille as part of its acquisition of RARE Hospitality International, Inc. ("RARE") on October 1, 2007.  RARE is now a wholly-owned subsidiary of Darden.

3.      Throughout the Class Period, Defendants made false and materially misleading statements about Darden's earnings potential for fiscal 2008 (June 1, 2007 to May 31, 2008),

17551v1

repeatedly assuring the market that the Company would achieve 10%-12% earnings growth, when Defendants knew, or recklessly disregarded, that this projection lacked any reasonable basis.

4.      As alleged more fully below, the 10% to 12% growth projection was, in part, predicated on a food cost inflation assumption of only 1.5%.  Prior to the start of the Class Period, however, *Amber Waves*, the food pricing standard published by the United States Department of Agriculture ("USDA"), reported that by May 2007, cost inflation for food (the food consumer price index ("CPI")) exceeded 3.1%.  Indeed, by the start of the Class Period, food cost inflation was more than 3.7%, and remained at that level until September 2007. By November 2007, the food CPI exceeded 3.8%.  Another economic publication by Wells Fargo & Co. corroborated these figures, with a forecast of plus 3-4% inflation for all food in June 2007. Defendants, who knew, or recklessly disregarded, that Darden's Class Period earnings growth projections were, in part, based on a food cost inflation assumption that was materially deficient, failed to disclose such information to the investing public.

5.      Exacerbating the foregoing was the fact that operating margins at the Company's newly acquired LongHorn and Capital Grille restaurants were lower than those of the Darden Legacy Restaurants due to pricing, cost and product mix structure.  For example, food costs for LongHorn and Capital Grille restaurants were approximately 7.0% higher than that of the Darden Legacy Restaurants.  Because of these differences, the operating margins for LongHorn and Capital Grille were about 5.1% (or $61 million) lower than the margins for the Darden Legacy Restaurants.  Defendants stated that the RARE acquisition would be neutral to earnings per share for fiscal year 2008 (*see* ¶32), but they never stated that the 5.1% margin shortfall would, coupled with other factors, make 10-12% growth unobtainable.  Defendants, who had performed

a due diligence of RARE, including the LongHorn and Capital Grille restaurant operations, in connection with the acquisition, knew, or recklessly disregarded, that they had no reasonable basis for the 10%-12% earnings growth projection due, in part, to this operating margin differential, but failed to disclose such information to the investing public.

6.      Darden attempted to offset the effects of the foregoing by increasing prices. Defendants, however, knew or recklessly disregarded that these price increases had self-defeating elements that also made 10% to 12% earnings growth unobtainable.  For example, a portion of the ameliorative effect of the price increases was negated by Darden's product promotions.  Typically, Darden promoted menu items with a lower price on television/radio or through print media to attract more customers to its restaurants.  But because of the nature of Darden's promotions, the Company experienced a negative mix shift of .15% or about $9 million – as customers bought the less expensive promotional menu items.  Defendants, who knew, or recklessly disregarded, that they had no reasonable basis for the 10% to 12% earnings growth projections due, in part, to the negative mix shift caused by the Company's promotional pricing, failed to such information to the investing public.

7.      Defendants also knew, or recklessly disregarded, and failed to publicly disclose that the 10% to 12% earnings growth projection lacked any reasonable basis due, in part, to an increase in Darden's wage expenses.  As announced on May 25, 2007, just weeks *prior* to the start of the Class Period, the national minimum wage was increased from $5.15 to $5.85 per hour, effective July 24, 2007.  States had concurrent wage increases as well.  By law, businesses must pay at the higher of either the state or the federal wage.  Many Southern and Western states – where Darden does a significant amount of business (*see* ¶50) – were at the old federal wage ($5.15), and, thus, moved to $5.85 on July 24, 2007.

8.      As alleged more fully below, Defendants therefore had no reasonable basis for their fiscal 2008 earnings growth projections.  Indeed, Defendants finally admitted on December 19, 2007 that the 10% to 12% earnings growth (or $35 to $42 million in earnings growth) for fiscal 2008 was unobtainable – downwardly revising that figure to 2-4%, including adverse integration and purchase accounting effects stemming from the RARE acquisition, or 7-9% without the effects of RARE.  In other words, excluding the extraordinary costs stemming from the acquisition, Defendants reduced their earnings growth projections by 25%-30%, or by a minimum of $10.5 million for fiscal 2008.  On this news, Darden stock fell about 25%, causing hundreds of millions of dollars in investor losses.

9.      Numerous Darden officers and directors collectively sold almost $20 million of Darden stock during the Class Period while in possession of material, inside information.

10.     On August 26, 2008, Darden announced a reprise of the events described herein  – once again substantially cutting fiscal year earnings growth projections from between $2.90 and $2.93 per share to $2.68 and $2.81 per share, sending its stock reeling.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act by the SEC [17 C.F.R. §240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.     Lead Plaintiffs, Carpenters Funds, as set forth in the certifications attached to their lead plaintiff motion and incorporated by reference herein, purchased the common stock of Darden during the Class Period and have been damaged thereby.

16.     Defendant Darden, through its subsidiaries, engages in the ownership and operation of casual dining restaurants in the United States and Canada. The Company operates restaurants under the names Red Lobster, Olive Garden, Bahama Breeze, and Seasons 52.  Under its RARE subsidiary, the Company operates The Capital Grille and LongHorn Steakhouse.

17.     (a)     Defendant Clarence Otis Jr. ("Otis") is and, at all relevant times, was the Executive Chairman and Chief Executive Officer of Darden.

        (b)     Defendant C. Bradford Richmond ("Richmond") is, and was at all relevant times, Chief Financial Officer, Principal Accounting Officer and Senior Vice President of Darden.

        (c)     Defendants Otis and Richmond are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Darden, were privy to confidential and proprietary information concerning Darden, its operations, finances, financial condition and present and future business prospects, including the results of the Company's due diligence of RARE, which included the LongHorn and Capitol Grille restaurant operations.  The Individual Defendants also had access to material,

18432v1                               5

adverse, non-public information concerning Darden, as discussed in detail below.  Because of their positions with Darden, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Darden's business.

20.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Darden's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Darden's common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Darden's common stock by disseminating materially false and misleading statements and/or concealing material, adverse facts.  The scheme: (i) deceived the investing public regarding Darden's business, operations, management and the intrinsic value of Darden's common stock; (ii) enabled certain Company insiders to sell 427,933 shares of their personally-held Darden common stock for gross proceeds in excess of $18.5 million; and (iii) caused Plaintiffs and members of the Class (defined below) to purchase Darden's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Darden between June 19, 2007 and December 18, 2007, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and

18432v1                                         7

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Darden common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Darden or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Darden;

(c)      whether the price of Darden common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

28.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False And Misleading Growth Projections

29.      The Class Period begins on June 19, 2007, when Darden issued a press release announcing its financial results for the fourth quarter and fiscal year ending May 27, 2007.  For the quarter, the Company reported net earnings from continuing operations of $98.5 million, or $0.67 per diluted share, and sales of $1.46 billion.  Defendant Otis, commenting on the results, stated, in pertinent part, as follows:

> We had competitively superior financial results from continuing operations this year in what was clearly a difficult environment for our industry and we also made considerable strategic progress.  As a result, we begin fiscal 2008 in a strong competitive position and with great confidence we can achieve our goal of being the best in casual dining, now and for generations.  When you combine the strength and resiliency that Olive Garden, Red Lobster and Bahama Breeze demonstrated this year, the promise that Seasons 52 continues to show, our talented and dedicated employees and the financial strength we possess, this Company's future is bright.  And it's a future that we believe will

be marked by an acceleration in profitable sales growth, beginning with our anticipated strong financial performance in fiscal 2008.

With regard to the Company's outlook, the press release stated, in pertinent part as follows:

First 2008 Outlook

Darden expects combined same-restaurant sales growth in fiscal 2008 of between 2% and 4% for Red Lobster and Olive Garden. The Company also expects approximately 3% unit growth in fiscal 2008, comprised mainly of Olive Garden restaurants.

"We expect that solid same-restaurant sales growth at Red Lobster, Olive Garden and Bahama Breeze and strong cost management, combined with an acceleration in new restaurant expansion at Olive Garden, *will result in 10% to 12% diluted net earnings per share growth from continuing operations in fiscal 2008," said Otis.  "We believe this is a well-supported growth plan that reflects the emerging cost pressures in the casual dining industry* and our expectation that casual dining sales growth will continue to be relatively soft before improving in the second half of our fiscal year."  [Emphasis added].

30.     As alleged more fully below, Defendants knew, or recklessly disregarded that the earnings growth projections of 10% to 12% were materially false and misleading because they lacked any reasonable basis.  As alleged more fully below, Defendants knew, but failed to disclose that:  i) Darden was utilizing a food cost inflation assumption that was well below then-current inflationary rates; ii) due to special product promotions, Darden experienced a negative mix shift of .15% or about $9 million, as customers bought the less expensive promotional menu items; and iii) Darden incurred materially increased wage expenses due to the increase in the federal minimum wage from $5.15 to $5.85 per hour just prior to the start of the Class Period.

31.     Defendants knew, or recklessly disregarded, that their statement that the projected 10% to 12% earnings growth was a "well-supported growth plan that reflects the emerging cost pressure in the casual dining industry" was materially false and misleading because Defendants failed to disclose that i) Darden was utilizing a food cost inflation assumption that was well below then-current inflationary rates; ii) due to special product promotions, Darden experienced

a negative mix shift of .15% or about $9 million, as customers bought the less expensive promotional menu items; and iii) Darden incurred materially increased wage expenses due to the increase in the federal minimum wage from $5.15 to $5.85 per hour just prior to the start of the Class Period.   As a consequence, Darden's 10% to 12% growth plan was not, in fact, "well supported," nor did it "reflect[] the emerging cost pressures in the casual dining industry."

32.     On August 16, 2007, Darden announced a definitive agreement to acquire RARE:

> Darden Restaurants Announces Tender Offer to Purchase RARE Hospitality for $38.15 Per Share; Further Positions Darden as a Leader in the Restaurant Industry
>
> ORLANDO, Fla., and ATLANTA, Aug 16, 2007 /PRNewswire-FirstCall via COMTEX News Network/ --
>
> Darden Restaurants, Inc. (NYSE: DRI) and RARE Hospitality International, Inc. (Nasdaq: RARE), today jointly announced a definitive agreement under which Darden will make a tender offer to purchase RARE's outstanding common stock for $38.15 per share in cash, or approximately $1.4 billion in total purchase price. The all-cash offer represents a 39% per share premium over RARE's average closing stock price for the past 30 days. The transaction received unanimous approval by the boards of directors of both companies.
>
> Darden will finance the acquisition through cash and newly committed credit facilities. Darden expects to commence the tender offer for all outstanding shares of RARE common stock on August 31, 2007. *The transaction is expected to be neutral to Darden's earnings per share in fiscal year 2008, excluding one-time transaction and integration related costs and the impact of purchase price accounting adjustments.* [Emphasis added].
>
> (Logo: http://www.newscom.com/cgi-bin/prnh/20050203/FLTH026LOGO )
>
> With annual sales of $1.0 billion, RARE Hospitality currently owns, operates and franchises 317 restaurants, including 287 LongHorn Steakhouse restaurants and 28 Capital Grille restaurants. LongHorn Steakhouse is a leader in the casual dining steakhouse category. The Capital Grille is a leader in the premium steakhouse category, with one of the highest average unit volumes and return on invested capital in the industry.

33.     Defendants' statement that the RARE acquisition would be neutral to earnings for fiscal year 2008 was materially false and misleading when made because Defendants failed to

disclose that there would be a margin shortfall of 5.1% from LongHorn and Capital Grill which, coupled with the other factors mentioned above (*see* ¶¶4, 6, 7), would make 10-12% growth unobtainable.

34.     On September 18, 2007, Darden issued a press release announcing its financial results for the fiscal first quarter of 2008, the period ended August 26, 2007.  For the quarter, the Company reported net earnings from continuing operations of $106.6 million, or $0.73 per diluted share, and sales of $1.47 billion.  Moreover, the Company reaffirmed its fiscal 2008 financial outlook.  Defendant Otis, commenting on the results, stated, in pertinent part, as follows:

> This quarter we once again delivered competitively superior financial results. We have talented teams in our restaurants and restaurant support center. Guided by a proven approach to our business that combines strong brand management and restaurant operations excellence, they are working on the right things.  We're delighted with how guests are responding, which is reflected in our track record of same-restaurant excellence.  It provides a strong platform for the accelerated new restaurant growth we plan with the pending acquisition of RARE Hospitality.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> Fiscal 2008 Financial Outlook
>
> Darden reiterated that it expects combined U.S. same-restaurant sales growth in fiscal 2008 of between 2% and 4% for Red Lobster and Olive Garden, and that it expects to open approximately 40 net new restaurants at its existing businesses this fiscal year.  As a result, the Company expects total sales growth from its existing businesses of between 6% and 7% in fiscal 2008.  *The Company continues to anticipate that diluted net earnings per share growth will be 10% to 12% in fiscal 2008, excluding one-time transaction and integration related costs and the impact of purchase price accounting adjustments related to the pending RARE Hospitality transaction.*
>
> Assuming the RARE Hospitality transaction closes in October 2007, as expected, the Company will provide an updated fiscal 2008 consolidated financial outlook including additional detail regarding the financial integration of RARE Hospitality, when it releases its second quarter earnings in December 2007.  [Emphasis added].

35.     After the Company's September 18, 2007 release reiterating the 10% to 12% growth figure, Darden stock rose from a close that day of $42.84 per share to open at $44.46 per share on September 19, 2007 and close that day at $43.63 per share, on high volume.

36.     As alleged more fully below, Defendants knew, or recklessly disregarded that the earnings growth projections of 10% to 12% were materially false and misleading due to Defendants' failure to disclose that the projections lacked any reasonable basis.  As alleged more fully below, Darden was utilizing food cost inflation assumption that was well below then-current inflationary rates; due to special product promotions, Darden experienced a negative mix shift of .15% or about $9 million, as customers bought the less expensive promotional menu items; and Darden incurred materially increased wage expenses due to the increase in the federal minimum wage from $5.15 to $5.85 per hour just prior to the start of the Class Period.

37.     On October 1, 2007, Darden published the following press release:

> Darden Restaurants Announces Successful Completion of Cash Tender Offer for Rare Hospitality International, Inc.
>
> ORLANDO, Fla. and ATLANTA, Oct 01, 2007 /PRNewswire-FirstCall via COMTEX News Network/ -- Darden Restaurants, Inc. (NYSE: DRI) announced today the successful completion of its tender offer to acquire all outstanding shares of common stock of RARE Hospitality International, Inc. (Nasdaq: RARE), at a price of $38.15 per share, in cash.
>
> The initial offering period for the tender offer expired at 12:00 midnight, New York City time, at the end of Friday, September 28, 2007, at which time a total of 26,991,599 shares of RARE common stock (excluding shares tendered under guaranteed delivery procedures) had been validly tendered and not withdrawn, representing 85.646% of the outstanding RARE common stock. Including the 4,743,236 shares tendered under guaranteed delivery procedures, more than 90% of the outstanding shares of RARE common stock were tendered in the tender offer. All shares that were validly tendered and not withdrawn have been accepted for purchase in accordance with the terms of the offer.
>
> Merger

Darden intends to promptly acquire all of the remaining RARE shares by means of a short-form merger under Georgia law at the same price per share paid in the tender offer. Upon completion of the merger, RARE will become a wholly owned subsidiary of Darden and will no longer be traded on the NASDAQ.

Darden Restaurants, Inc., headquartered in Orlando, FL, owns and operates over 1,400 Red Lobster, Olive Garden, Bahama Breeze, Smokey Bones and Seasons 52 restaurants with annual sales of $5.6 billion.

RARE Hospitality International, Inc., headquartered in Atlanta, GA, currently owns, operates and franchises 323 restaurants, including 292 LongHorn Steakhouse restaurants and 29 The Capital Grille restaurants.

38.     Subsequent to the completion of RARE acquisition, Defendants failed to revise the 10%-12% earnings growth projections, which were last publicly reiterated on September 18, 2007.  As alleged more fully below, Defendants knew, or recklessly disregarded that the earnings growth projections of 10% to 12% were materially false and misleading, and lacked any reasonable basis, and Defendants' failed to disclose that: i) Darden was utilizing a food cost inflation assumption that was well below then-current inflationary rates; ii) the operating margins at the newly acquired LongHorn Steakhouse and Capital Grille restaurants were materially lower than at the Darden Legacy Restaurants; iii) due to special product promotions, Darden experienced a negative mix shift of .15% or about $9 million, as customers bought the less expensive promotional menu items; and iv) Darden incurred materially increased wage expenses due to the increase in the federal minimum wage from $5.15 per hour to $5.85 per hour during the Class Period.

### Defendants Knew, or Recklessly Disregarded, That
### There Was No Reasonable Basis For Their Earnings Growth Projections

39.     Analysis of certain financial assumptions described in Defendant Richmond's public statements shows that Darden's 10%-12% earnings growth projections were based, in part, on a fiscal 2008 cost inflation assumption of 1.5%.  Although this cost inflation assumption

was not publicly disclosed, in a May 27, 2007 conference call, Defendant Richmond, Darden's

CFO, disclosed other financial assumptions for fiscal 2008, from which the cost inflation rate can

be mathematically extrapolated.  These included 2-4% same store sales growth, 40 new stores

opening, and 20 basis points in operating margin improvement through general and

administrative "leverage." Using these metrics, Darden could only have achieved fiscal growth

of 10% to 12% for 2008 ($.25 to $.30 growth per share, or $35 to $42 million) if cost inflation *in*

*total* was 1.5%, or less, or if same stores sales growth was greater than Darden's 2-4% guidance.

The chart below illustrates that to even achieve the low end of the earnings growth projections,

10% ($.25 per share or $35 million), cost inflation could not have exceeded 1.5%:

**Darden Fiscal 2008 Cost Inflation Analysis**

|  | Scenario |
|---|---|
| Cost Inflation assumption | 1.50% |
| Guidance was: 2-4% SSS, 40 opens, 20 bpts margin improvement | |
| | |
| SSS Gain: 2007 Sales base: $5550M times .02=$111M in sales, $55.5M in var. profit (50% flow through) | $55.5 |
| Opens: 40 opens times $860K earnings/unit times .50 (for phasing) =17,200K | $17.2 |
| Margins: Op. Margin improvement forecast (5550K times .0020) | $11.1 |
| Sub-Total Net Profit Increases | $83.8 |
| Inflation: Cost inflation assumption: $5180K expense base | $77.7 |
| less: other cost containment underway: $30M | $30.0 |
| Sub-Total Net Cost shifts | $47.7 |
| **Net Impact to earnings** | $36.1 |
| EPS Impact | 0.25 |

40.    Several contemporaneous industry publications, however, show that Defendants

had no reasonable basis for utilizing a 1.5% cost inflation assumption.  The most authoritative

publication in food pricing, *Amber Waves*, reported cost inflation at 3.7% for all food, more than

double Darden's 1.5% assumption, prior to the start of the Class Period.  Likewise, The Wells

Fargo (Staff Economist white paper) tracked 2007 food inflation at 3.5 to 4%.

41.    The United States Bureau of Labor Standards surveys consumers and businesses

monthly on the *actual* cost of production and inputs. The USDA Economic Research Service

*forecasts* agricultural item costs going forward.  Six times per year, they publish *Amber Waves*, which is their flagship reporting and forecasting publication. The senior economist forecasts food consumer price index through a weighted model of inputs and demand.  The following chart contains the actual total food CPI for 2007, taken from the USDA Amber Waves archives (*available at* www.ers.usda.gov) during the relevant period:

| Month | Total Food CPI Increase vs. prior year |
|-------|----------------------------------------|
| May 2007 | Plus 3.1% |
| June 2007 | Plus 3.7% |
| Sept 2007 | Plus 3.7% |
| November 2007 | Plus 3.8% |

42.    In addition to the above-referenced publicly available information, all restaurant-oriented companies, such as Darden, subscribe to food commodity cost forecasting services and deal with food brokers and manufacturers on a daily basis. Indeed, Darden utilized a particularly sophisticated supply chain operation, overseen by four vice presidents.  Therefore, Defendants had the ability to make relatively accurate commodity cost projections.  In fact, in the June 19, 2007 press release, Defendant Otis specifically represented that the Company's earnings growth plan was "well-supported" and "reflect[ed] the emerging cost pressures in the casual dining industry."

43.    Accordingly, at the time that Defendants issued the earnings growth projections, they knew, or recklessly disregarded, and failed to disclose that these projections lacked any reasonable basis due, in part, to Defendants' utilization of a cost inflation assumption that was materially deficient based on market data that was publicly available throughout the Class Period.  Defendants also knew, or recklessly disregarded, that the 10% to 12% earnings growth plan was neither well-supported, nor reflected emerging industry cost pressures due to the Company's utilization of a 1.5% cost inflation assumption.

44.     Defendants also knew, or recklessly disregarded, that the operating margins at the Company's newly acquired LongHorn and Capital Grille restaurants were, historically, approximately 5.1% ($61 million annually) less than the margins at the Darden Legacy Restaurants.  This was primarily due to the pricing, cost and product mix structure at RARE, which yielded a food cost percentage about 7.0% percentage points higher than that of Darden, whereas the Darden brands had lower food cost and thereby higher restaurant-level profit margins.  The following is a comparison of the operating margins at the RARE restaurants and the Darden Legacy Restaurants during the period preceding Darden's acquisition of RARE:

Darden vs. RARE Margin Analysis, Pre-acquisition
39 weeks, ending 26 Aug 2007 (DRI) and 30 Sept 2007 (RARE)
$ (000s)

|  | DRI | RARE | Difference |
|---|---|---|---|
| Total System Sales | $4,470.20 | $792.10 | |
| Cost of sales, % | 29.30% | 36.60% | 7.30% unfavorable |
| Restaurant Margin % | 23.48% | 18.37% | 5.11% unfavorable |
| Restaurant Margin per unit | $791 | $472 | $319K per unit unfavorable |

Source: Darden and RARE 10Qs from 2007, 2006

DRI includes Red Lobster, Olive Garden, Bahama Breeze, Seasons 52
RARE brands include LongHorn, Capital Grille

45.     Defendants knew, or recklessly disregarded, and failed to disclose that they lacked any reasonable basis in fact for the maintaining the 10% to 12% earnings growth projections after Darden's acquisition of RARE because Defendants' RARE acquisition-related due diligence showed that the recently acquired LongHorn and Capital Grille restaurants had lower operating margins than Darden's Legacy Restaurants.

46.     Darden attempted to maintain its operating margins through price increases during the Class Period.  Darden, however, experienced less than the calculated ameliorative effect from the price increases because of the negative margin effects of the Company's product promotions. Typically, Darden promoted menu items on television/radio or through print media, with a lower price in order to attract more customers.  Because of the nature of Darden's promotions, however, the Company actually experienced a negative mix shift of .15% or about $9 million, as customers bought the promotional, less expensive menu items.  Examples include Olive Garden's $8.99 Never Ending Pasta Bowl promotion in September and October 2007, and the $16 Red Lobster Endless Shrimp seafood promotions. These prices are less than the Darden overall average check (*e.g.*, average sales per customer), thereby causing the negative mix shift.

47.     In other words, the menu item promotions actually caused further erosion in the Company's operating margins during the Class Period.  Defendants knew, or recklessly disregarded, and failed to disclose that the 10% to 12% earnings growth projections lacked any reasonable basis due to the erosion of the Company's restaurants' operating margins resulting from Darden's menu pricing promotions.

48.     Finally, Darden experienced increased wage expenses due to the July 24, 2007 implementation of the increase in the federal minimum wage, from $5.15 to $5.85 per hour. Indeed, the increase was signed on May 25, 2007, *prior* to the Class Period.

49.     While Darden specifically identified increases in the federally and state mandated minimum wage as a risk factor in its public filings (*see, e.g.,* Darden Form 10-K, for the year ended May 27, 2007, filed with the SEC on July 19, 2007 at 13), the Company failed to revise its earnings growth projections of 10% to 12% even after the federal minimum wage increase was implemented in July 2007.

50.     By law, businesses must pay at the higher of either the state or the federal wage. Darden had a material amount of restaurants in Southern and Western states, which were the states most affected by the new law.  For example, the following states increased their minimum wages from $5.15 to $5.85 in July 2007, and the amount of stores Darden operated during the Class Period in each state, were: Alabama (23), Idaho (8), Indiana (38), Kansas (11), Kentucky (15), Louisiana (11), Michigan (51), Nebraska (8), New Mexico (11), North Dakota (4), Oklahoma (16), South Carolina (24), South Dakota (4), Tennessee (30), Texas (115), Utah (14), Virginia (44), and Wyoming (2).

51.     Defendants knew, or recklessly disregarded, and failed to disclose that the 10% to 12% earnings growth projections lacked any reasonable basis in fact due, in part, to the increase in the Company's wage expenses resulting from the increase in the federal minimum wage on July 24, 2007.   Defendants also knew, or recklessly disregarded, that the Company's earnings growth plan was neither well-supported, nor reflected emerging industry cost pressures due to the Company's failure to adequately account for the increase in the minimum wage.

**<u>Defendants Disclose that the Projected Earnings Growth is Unobtainable</u>**

52.     On December 18, 2007, after the markets closed, Darden issued a press release radically revising the 10% to 12% earnings growth projections:

> Fiscal 2008 Financial Outlook
>
> Darden confirmed that it continues to expect combined U.S. same-restaurant sales growth in fiscal 2008 of between 2% and 4% for Red Lobster, Olive Garden and LongHorn, and that it expects to open approximately 65 net new restaurants this fiscal year, including new restaurants at LongHorn Steakhouse and The Capital Grille for October 2007 through May 2008. As a result, the Company expects total sales growth of between 19% and 20% in fiscal 2008, including sales from LongHorn Steakhouse and The Capital Grille for October 2007 through May 2008, compared to reported sales of $5.57 billion in fiscal 2007. Given the dynamics of the current cost environment, which are due in part to the impact a weaker U.S. dollar is having on commodities and the cost of products Darden imports from many different countries, *the Company now*

> *anticipates that diluted net earnings per share growth will be 2% to 4% in fiscal 2008, which includes the transaction and integration related costs and purchase accounting adjustments related to the RARE Hospitality acquisition. These costs and adjustments will adversely impact diluted net earnings per share by approximately five percentage points in fiscal 2008. Excluding the transaction and integration related costs and purchase accounting adjustments, diluted net earnings per share growth would be 7% to 9% in fiscal 2008.* [Emphasis added].

53.    Upon this 25%-30% downward revision of the Company's earnings growth projections, the price of Company's stock fell $7.68 per share, or over 21%, to close at $28.39 per share, on extremely heavy trading volume.

## POST-CLASS PERIOD EVENTS

54.    Suggesting that substantially inflated full-year earnings figures are becoming something of a pattern, on August 26, 2008, Darden announced:

**Darden Restaurants expects 1st-quarter profit to miss expectations, cuts full-year outlook**

ORLANDO, Fla. (AP) -- Darden Restaurants Inc. on Tuesday forecast fiscal first-quarter profit below Wall Street estimates and trimmed its full-year guidance, citing a more challenging economic and consumer environment.

The news sent shares plummeting 13 percent after the opening bell, or $4.21, to $28.05. Casual dining chains like Darden's Red Lobster and Olive Garden restaurants have been hit hard as consumers cut back on eating out amid rising gas prices and the continued housing slump.

Darden forecast fiscal first-quarter earnings between 60 cents and 62 cents per share, excluding one-time charges, including costs from its acquisition of RARE Hospitality International in October 2007.

Analysts polled by Thomson Reuters have predicted much higher fiscal first-quarter earnings of 75 cents per share, on average. Darden is scheduled to report first-quarter results on Sept. 16 after the market close.

The company predicted fiscal first-quarter same-store restaurant sales at its Red Lobster, Olive Garden and LongHorn Steakhouse locations will decline 1.1 percent. Same-store sales, or sales at locations open at least a year, is a key indicator of retail performance because it measures results at existing, rather than newly opened, locations.

*The company also cut its full-year outlook. For fiscal 2009, Darden said it now expects earnings per share growth of between 5 percent and 10 percent, implying earnings between $2.68 and $2.81 per share. Previously, Darden expected full-year earnings of between $2.90 and $2.93 per share on revenue of $7.56 billion to $7.62 billion.  [Emphasis added].*

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded: that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and knowingly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Darden, their control over, and/or receipt and/or modification of Darden's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential, proprietary information concerning Darden, participated in the fraudulent scheme alleged herein.

56.     Defendants knew or recklessly disregarded that their 10% to 12% fiscal 2008 earnings growth projections were materially false and misleading, and lacked any reasonable basis in fact, when made because: i) Darden was utilizing a food cost inflation assumption that was well below then-current inflationary rates; ii) the operating margins at the newly acquired LongHorn Steakhouse and Capital Grille restaurants were materially lower than at the Darden Legacy Restaurants; iii) due to special product promotions, Darden experienced a negative mix shift of .15% or about $9 million, as customers bought the less expensive promotional menu items; and iv) Darden incurred materially increased wage expenses due to the increase in the

federal minimum wage from $5.15 per hour to $5.85 per just prior to the start of the Class Period.

57.     Defendants were also motivated to engage in this course of conduct in order to allow certain Company insiders to sell 427,933 shares of their personally-held Darden common stock for gross proceeds in excess of $18.5 million.  These insider trades *all* took place within a three week time period following the materially false and misleading September 18, 2007 statement reiterating 10% to 12% earnings growth.  After the Company's September 18, 2007 release reiterating the 10% to 12% growth figure, Darden stock rose from a close that day of $42.84 per share to open at $44.46 per share on September 19, 2007 and close that day at $43.63 per share, on high volume.  The insider shares sold during the Class Period are set forth below:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | | | | |
| LAURIE BURNS, SENIOR VP | 9/24/2007 | 31,044 | $43.36 | $1,346,068 |
| | | | | |
| VALERIE COLLINS, SENIOR VP & CORPORATE CONTROLLER | 10/4/2007 | 35,104 | $43.43 | $1,524,567 |
| | | | | |
| DAVID GEORGE, PRESIDENT OF LONGHORN STEAKHOUSE | 10/4/2007 | 82,710 | $43.34 | $3,584,651 |
| | | | | |
| EUGENE LEE, PRESIDENT OF SPECIALTY RESTAURANT GROUP | 10/2/2007 | 75,000 | $43.21 | $3,240,750 |
| | | | | |
| DANIEL LYONS, SENIOR VP OF HUMAN RESOURCES | 9/24/2007 | 129,416 | $43.26 | $5,598,536 |
| | | | | |
| CORNEILUS  MCGILLICUDDY, DIRECTOR | 10/11/2007 | 23,250 | $44.06 | $1,024,395 |
| | | | | |
| BARRY MOULLET, SENIOR VP OF SUPPLY CHAIN | 9/27/2007 | 29,000 | $43.21 | $1,253,090 |
| | | | | |
| DAVID PICKENS, SENIOR VP, PRESIDENT OF OLIVE GARDEN | 9/21/2007 | 22,409 | $44.07 | $987,565 |
| | | | | |
| | Total: | 427,933 | | $18,559,622 |

## LOSS CAUSATION/ECONOMIC LOSS

58.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and/or a course of conduct which artificially inflated the prices of Darden's common stock and operated as a fraud or deceit on Class Period purchasers of Darden's common stock by making materially false and misleading statements concerning the Company's 10%-12% earnings growth projections for fiscal 2008, and omitting to disclose that such projections had no reasonable basis for the reasons alleged above.   When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Darden's common stock fell precipitously as the prior artificial inflation was removed from the price of the stock.   As a result of their purchases of Darden's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

59.     As a direct result of Defendants' disclosures on December 18, 2007, the price of Darden common stock fell precipitously, falling by $7.68 per share, or approximately 21%.   This price drop removed the artificial inflation from the price of Darden common stock, causing real economic loss to investors who had purchased Darden common stock during the Class Period.

60.     The 21% decline in the price of Darden common stock after this disclosure was a direct result of Defendants' fraud being revealed to investors and the market.   The timing and magnitude of the price decline in Darden common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of

Darden common stock and the subsequent significant decline in the value of Darden common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET DOCTRINE

61.    At all relevant times, the market for Darden's common stock was an efficient market for the following reasons, among others:

(a)    Darden common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Darden filed periodic public reports with the SEC and the NYSE;

(c)    Darden regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Darden was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

62.    As a result of the foregoing, the market for Darden common stock promptly digested current information regarding Darden from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Darden common stock during the Class Period suffered similar injury through their purchase of Darden common stock at artificially inflated prices and a presumption of reliance applies.

63.     The market for Darden common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Darden's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Darden's common stock relying upon the integrity of the market price of Darden's common stock and market information relating to Darden, and have been damaged thereby.

64.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Darden's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

65.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Darden's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Darden and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

66.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Darden who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

67.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

70.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Darden common stock.  Plaintiffs and the Class would not have purchased Darden common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Darden common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

72.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Darden within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By reason of their positions as officers and/or directors of Darden, and their ownership of Darden stock, the Individual Defendants had the power and authority to cause Darden to engage in the wrongful conduct complained of herein.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class

members against all Defendants for all damages sustained as a result of Defendants' wrongdoing,

in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  September 2, 2008                **BARKER RODEMS & COOK, P.A.**


**/s/ Chris A. Barker**
_____
Chris A. Barker
FL Bar No. 885568
400 N. Ashley Drive, Suite 2100
Tampa, Florida  33602
Telephone: (813) 489-1001
Facsimile: (813) 489-1008
cbarker@barkerrodemsandcook.com

**Liaison Counsel for Lead Plaintiffs**
**Carpenters Funds and the Class**

Timothy J. MacFall
Joseph R. Seidman, Jr.
**BERNSTEIN LIEBHARD & LIFSHITZ,**
**LLP**
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**Lead Counsel for Lead Plaintiffs**
**Carpenters Funds and the Class**

18432v1                          28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2008, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

all registered CM/ECF participants.

**BARKER, RODEMS & COOK, P.A.**

**<u>/s/ Chris A. Barker</u>**
**Chris A. Barker, Esquire**